475 S.E.2d 439

Thomas E. STONE, Plaintiff Below, Appellee,

v.

UNITED ENGINEERING, A DIVISION OF WEAN, INCORPORATED, and/or United Engineers and Constructors, Inc., and/or United Engineering Corporation, a Foreign Corporation; and Ravenswood Aluminum Corporation, a Corporation, Defendants Below, Appellees,

Kaiser Aluminum & Chemical Corporation, a Corporation, Appellant.

No. 23101.

Supreme Court of Appeals of West Virginia.

Submitted April 24, 1996.

Decided July 8, 1996.

Charles R. McElwee, John C. Palmer, IV, Sarah Stump Kolb, Robinson & McElwee, Charleston, for Appellant Kaiser Aluminum & Chemical Corporation.

Arden J. Curry, Arden J. Curry, II, Pauley, Curry, Sturgeon & Vanderford, Charleston, for Appellee Thomas E. Stone.

Allen R. Prunty, Jackson & Kelly, Charleston, for Appellee Kaiser Engineering, Inc.

Thomas E. Scarr, John R. Teare, Jr., Charleston, for Appellee Ravenswood Aluminum.

McHUGH, Chief Justice:

This is an appeal from the judgment order of November 21, 1994 and from the subsequent order of February 24, 1995, denying defendant Kaiser Aluminum & Chemical Corporation's (hereinafter "Kaiser") motion for judgment notwithstanding the verdict or,

in the alternative, for a new trial.[1] Following a jury trial in the Circuit Court of Kanawha County, Kaiser was ordered to pay to plaintiff Thomas E. Stone $722,195.11 plus post-judgment interest and costs[2] after the jury found Kaiser 25% at fault for plaintiff's injuries resulting from the negligent design of the hotline at the aluminum fabrication facility formerly owned by Kaiser.[3] This Court has before it the petition for appeal, all matters of record and the briefs and arguments of counsel. For the reasons stated below, the orders of the circuit court are affirmed, in part; reversed, in part, and remanded, with directions.

I.

On or about February 7, 1989, Kaiser sold its aluminum fabrication facility located near Ravenswood, West Virginia, to Ravenswood Aluminum Corporation (hereinafter "Ravenswood Aluminum"). On or about December 22, 1990, plaintiff, along with 1700 other workers, was hired by Ravenswood Aluminum to replace hourly union employees involved in a labor dispute.

In January of 1991, plaintiff began working on the facility's hotline as a tilt pot operator. The hotline, approximately 440 yards long, is a powered conveyor system which, in addition to the tilt pot, consists of three mills[4] which compress heated aluminum ingots so that the aluminum can be formed into rolls, a number of shears, auxiliary or exit equipment associated with the finishing mill, and 360 rollers on various roll tables connecting the three mills. The rollers, which are mounted horizontally, are connected to the power source so that the aluminum ingots

1. The February 24, 1995 order also modified several aspects of the judgment order by, *inter alia,* ordering a reduction of the award of future lost wages by $2,565, to $42,435 as well as a reduction of the award of past lost wages by $3,834, to $71,166.

2. Prior to trial, plaintiff had entered into settlement agreements with defendant Ravenswood Aluminum Corporation, for the sum of $73,000, and with defendant Wean, Incorporated, d/b/a United Engineering, for the sum of $2,000. These amounts were credited to the judgment originally awarded to plaintiff by the jury, result-

ing in an award of $722,195.11 plus post-judgment interest and costs.

3. According to the November 21, 1994 and February 24, 1995 orders, certain claims remain pending between Kaiser and Ravenswood Aluminum concerning an indemnity agreement previously entered into by them. The action between these two parties was ordered to remain on the docket of the court.

4. The three mills are the 168–inch mill, or reversing mill; the 110–inch mill, or intermediate mill; and the 112–inch mill, or the finishing mill.

can be transported along the conveyor system.[5]

The tilt pot operator's station is located at the beginning, or northernmost end, of the hotline. The tilt pot is a mechanical apparatus which holds heated aluminum ingots[6] in a vertical position. The tilt pot operator uses a series of controls to tip the tilt pot onto the roll tables to be processed by the operator at the 168–inch reversing mill, the first major component through which ingots pass after leaving the tilt pot. A tilt pot operator is also required, among other things, to walk onto the hotline (the powered conveyor system) to take the temperature of heated ingots with a hand-held probe. To do this, tilt pot operators must walk in front of, behind and alongside heated ingots while other ingots are being processed on the hotline by other operators.

On January 22, 1991, plaintiff was injured while he was standing on a walkway between the rollers, directly behind the north end (rear) of an aluminum ingot, checking the ingot's temperature. In the meantime, another ingot was being processed in the 168–inch reversing mill. The operator of the 168–inch mill inadvertently made a reverse pass on the heated ingot being processed, causing the ingot to travel north and to strike the south end (front) of the ingot behind which plaintiff was standing.[7] Plaintiff's right leg became pinned between the roll table and the ingot, resulting in the amputation of plaintiff's leg below the knee.

It is undisputed that the powered conveyor system, or hotline, was designed by Kaiser, beginning operation sometime in 1957. Kaiser's design provided no device for a tilt pot operator such as plaintiff, while walking on the conveyor system, to de-energize, or stop, it, so as to prevent mill operators from inadvertently sending heated ingots back into the tilt pot operator's station.[8]

5. Plaintiff's engineering expert, Dr. Rolin Barrett, explained that the hotline is

where hot aluminum is run through rolls to reduce it in size, and to do this, it's carried from the entrance place, either through a tilt pot or put directly onto a conveyor system, and then this ingot is moved through the mill, through the rolls, where it's reduced in size as it passes through, then it's brought back through and reduced some more, and this is done back and forth until it's reduced to the desired dimension.

The process of moving the ingot or slab is one of using a conveyor system. This conveyor system is what we refer to as powered rolls.... What we have in this case is a horizontal system that these rolls are· driven by electric motors. That's why they're called powered rolls. As these rolls turn, the slab on top of it is moved along. In the system that comprises the conveyors at Ravenswood [Aluminum], or the hotline at Ravenswood [Aluminum], I should say, these rolls can be driven in what is sometimes called a forward direction, sometimes a reverse direction. They can be driven, separate pieces of them can be driven independently. One can be going forward, one can be going reverse.

There's one place where the rolls are spl[it] [in] half. The roll only goes halfway across and another roll comes into another side halfway across. These rolls can be driven together to move something in one direction or one can be driven forward and the other one driven in reverse to move something around, to make it rotate.

6. The aluminum ingots range in temperature from 715 to 1,050 degrees.

7. The 168–inch mill operator, Jim Presley, was a salaried Ravenswood Aluminum employee who, until commencement of the labor dispute, had no experience in operating the 168–inch mill. Mr. Presley had only received one week of training on the mill, compared to a typical Kaiser employee, who would have had at least twenty years of experience before he would operate a 168–inch mill even on a relief basis. Moreover, it was revealed at trial that plaintiff likewise received only twenty hours of training before he began working as a tilt pot operator, whereas, typically, a Kaiser employee would have had fifteen to twenty years of experience before working in that position. Nevertheless, as plaintiff points out, Kaiser's counsel, during closing argument, argued that the jury should find plaintiff 0% at fault for his injuries. The verdict form indicates that the jury, in fact, found plaintiff to be 0% at fault.

8. Plaintiff's engineering expert, Dr. Rolin Barrett, testified that Kaiser subsequently redesigned the conveyor system so that it could process longer ingots, resulting in a reduced margin of safety for tilt pot operators on the walkway. This testimony was uncontroverted:

Q. [by plaintiff's counsel] [F]or the first at least ten years of this factory, ingots from the soaking pits [ovens where ingots were heated and from where they were lifted vertically to the tilt pot] would come through, instead of being 79 feet long, they would be 45 feet long; is that right?

A. [by Dr. Barrett] That's right.

Q. So that the distance between the end of that ingot and the end of ingots to be pro-

## II.

### A.

Kaiser's first argument on appeal is that the trial court committed reversible error in failing to rule, as a matter of law, that plaintiff's claim against it for negligent design of the hotline was barred under *W. Va. Code,* 55–2–6a [1983], the statute of repose.[9] *W. Va. Code,* 55–2–6a [1983] provides:

No action, whether in contract or in tort, for indemnity or otherwise, nor any action for contribution or indemnity to recover damages for any deficiency in the planning, design, surveying, observation or supervision of any construction or the actual construction of any improvement to real property, or, to recover damages for any injury to real or personal property, or, for an injury to a person or for bodily injury or wrongful death arising out of the defec-

cessed at the tilt pot operator's station would be significantly larger; is that correct?

A. The distance would be much greater, that's true.

. . . .

Q. [I]n your review of records, what occurred in the late '60s or early '70s at this facility regarding the type of ingots they used?

A. At this time, in the late '60s or early '70s, they started also using a longer ingot that came out of a furnace, and they referred to this as a walking beam due to the mechanism that transported it.

Q. Are those the ones that we're talking about that can be 280, 285, up to 290 inches long?

A. That's correct.

Q. And when one of those ingots is being processed and goes through, how long would that get before it's reduced to seven inches when it's going on its last edging pass?

A. When it's on its last edging pass north, it's reduced to about seven inches and it's 83 feet long.

Q. So that, I take it, what occurred before is that if we use the ingots that are there when you used soaking pit ingots, you're talking about an ingot that was 35 feet shorter; is that correct?

A. That's right.

Q. Plus when it went through its last pass, the ingot at the ingot receiving table would be ten feet shorter; is that correct?

A. That's correct.

Q. And when the walking beam oven came in, that eliminated or shortened up that distance that ends up between the two when you're rolling them; is that correct?

A. Yes.

Q. *I take it that really what we're talking about is a safety margin that went down from 60 feet to somewhere around 15 to 10 feet, is that correct?*

A. *That's true. The clearance would be 10 to 15 feet between the end of the slab and the end of the walking beam ingot.*

Q. How fast do those ingots travel northbound when they're going through on the rollers?

A. They can travel as high as ten feet per second, which is about six or seven miles an hour.

Q. *So that when we're dealing with ingots that came out of the soaking pit, we're talking about the six second safety margin?*

A. *That's correct, which there's a 60 feet span between the end of the slab that's moving north and the ingot that's sitting on the ingot receiving table, and if it's moving, the slab is moving at ten feet per seck [sic], it would move for a time of six seconds before it got up to that ingot.*

Q. *What happened to that safety margin when the walking beam ingots went in?*

A. *When the walking beam ingots went in, that distance dropped down to 10 to 15 feet, so that meant that only one to one and a half seconds was required for that slab to move up and hit that ingot.*

Q. *Now that ingot is being controlled by the 168-inch mill when it's going northbound on its edging pass; is that correct?*

A. *Yes.*

Q. *In order to preclude that ingot from hitting someone in the tilt pot area, that operator then has to react and stop the ingot within that 15 feet span; is that correct?*

A. *Yes.*

Q. *And if the operator becomes inadvertent for a second to a second and a half, you're going to have a collision; is that correct?*

A. *That's true, that's all it takes.*

. . . .

Q. *Based upon your review of the blueprints and diagrams dealing with this facility, which Kaiser made the changes and allowed walking beam ingots to be produced and this safety margin went from 60 feet to 10 to 15 feet, were any changes made in the controls in order that anything would change as to who could operate which particular rollers?*

A. *No, there were no changes.*

(emphasis added).

9. Kaiser made a motion for summary judgment on several grounds, one of which was that the statute of repose barred plaintiff's claim as a matter of law. By order of September 23, 1994, the trial court denied Kaiser's motion. Subsequently, Kaiser made a motion for a directed verdict following plaintiff's case-in-chief and, similarly, one of the grounds for said motion was the applicability of the statute of repose. However, that motion was likewise denied.

tive or unsafe condition of any improvement to real property, may be brought more than ten years after the performance or furnishing of such services or construction: Provided, That the above period shall be tolled according to the provisions of section twenty-one [§ 55–2–21] [10] of this article. The period of limitation provided in this section shall not commence until the improvement to the real property in question has been occupied or accepted by the owner of real property, whichever occurs first.

(footnote added). *See Gibson v. Department of Highways,* 185 W.Va. 214, 406 S.E.2d 440 (1991) (holding *W.Va.Code,* 55–2–6a [1983] constitutional).

 We find, as a matter of law, that *W. Va.Code,* 55–2–6a [1983] was not intended to extend repose to a defendant such as Kaiser, which not only designed, but also owned, the hotline. Accordingly, it was not error for the trial court to deny Kaiser's motions for summary judgment and for a directed verdict on this issue.[11]

Kaiser's primary contention is that, under *W. Va.Code,* 55–2–6a [1983], a defendant which engages in the activities or services enumerated in the statute may be protected from liability for any deficiency in the performance of such activities. While plaintiff argues that our statute of repose applies only to architects and builders,[12] Kaiser maintains that the statute is much broader, protecting those who allegedly commit "any deficiency in the planning, design, surveying, observation or supervision of any construction or the actual construction of any improvement to real property," *Id.,* in relevant part,[13] regardless of the defendant's profession or occupational status. Kaiser thus contends that because it performed the statutorily-protected activity of designing the hotline on which plaintiff was injured, it is entitled to repose under *W.Va.Code,* 55–2–6a [1983].

Indeed, the trend of the majority of jurisdictions has been to extend repose to defendants, not on the basis of their status as architect or builder, but on the precondition that they have performed one of the enumerated activities or services in the statute with respect to an improvement to real property.[14] *See, e.g., Snow v. Harnischfeger Corp.,* 12 F.3d 1154 (1st Cir.1993), *cert. denied,* 513

---

10. *W. Va.Code,* 55–2–21 [1981], which provides, *inter alia,* that "the running of any statute of limitation shall be tolled for, and only for, the pendency of that civil action as to any claim which has been or may be asserted therein by counterclaim, whether compulsory or permissive, cross-claim or third-party complaint[,]" is not applicable to this case.

11. *See* section II, subsection B of this opinion regarding the hotline as an improvement to real property. Our discussion of whether the hotline is an improvement to real property, while not determinative of the applicability of *W. Va.Code,* 55–2–6a [1983], is nevertheless relevant to our discussion of Restatement (Second) of Torts § 352, regarding nonliability of a vendor of real property following the sale thereof. *See* section III, *infra.*

12. *See Basham v. General Shale,* 180 W.Va. 526, 529, 377 S.E.2d 830, 833 (1988) ("Statutes such as § 55–2–6a (1988) have been enacted in many jurisdictions and are commonly referred to as 'architects' and builders' statutes.' The purpose behind these statutes is to limit the time within which actions can be brought against architects, engineers, and others in the construction industry who are responsible for, in the language of our statute, 'the planning, design, surveying, observation or supervision of any construction or the actual construction of any improvement to real property.' *See* Annot., 93 A.L.R.3d 1242 (1979)."); *See Shirkey v. Mackey,* 184 W.Va. 157, 399 S.E.2d 868 (1990); *Gibson, supra.*

13. *W. Va.Code,* 55–2–6a [1983] further bars recovery, after ten years, for damages arising from " 'the actual construction of any improvement to real property ... [and] for an injury to a person or for bodily injury or wrongful death arising out of the defective or unsafe condition of any improvement to real property[.]' " *Gibson,* 185 W.Va. at 220, 406 S.E.2d at 446 (*quoting W.Va. Code,* 55–2–6a [1983]).

14. This is not the case in jurisdictions where statutes of repose expressly protect only certain named professions. *See, e.g.,* Colo.Rev.Stat. § 13–80–104 (1987) (architects, contractors, builders, engineers, inspectors); Conn. Gen.Stat. § 52–584a (1991) (architects, professional engineers); Me.Rev.Stat.Ann. Tit. 14, § 752–A (West 1980) (duly licensed architects and professional engineers); Mich. Comp. Laws § 600.5839 (1987) (state-licensed architects and professional engineers); R.I. Gen. Laws § 9–1–29 (1985) (architects, professional engineers, contractors, subcontractors, materialmen); Tex. Civ. Prac. & Rem.Code Ann. § 16.008–.009 (West 1986) (licensed or registered architects and engineers).

U.S. 808, 115 S.Ct. 56, 130 L.Ed.2d 15 (1994) (overhead crane manufacturer which, in the language of Massachusetts' statute of repose, committed "any deficiency or neglect in the design, planning, construction, or general administration of an improvement to real property[,]" is protected under the statute); *Herriott v. Allied Signal, Inc.*, 998 F.2d 487 (7th Cir.1993) (Illinois' statute of repose, protects, on its face, any defendant which engages in "the design, planning, supervision, observation or management of construction, or construction of an improvement to real property after 10 years have elapsed from the time of such act or omission."). *See also Ball v. Harnischfeger Corp.*, 877 P.2d 45 (Okl.1994); *Barnes v. Westinghouse Elec. Corp.*, 962 F.2d 513 (5th Cir.1992), *cert. denied*, 506 U.S. 999, 113 S.Ct. 600, 121 L.Ed.2d 536 (1992); *Beaver v. Dansk Industri Syndicat A/S (DISA)*, 838 F.Supp. 206 (E.D.Pa.1993); *Howell v. Burk*, 90 N.M. 688, 568 P.2d 214 (App.), *cert. denied*, 91 N.M. 3, 569 P.2d 413 (1977); *Matthews v. Beloit Corp.*, 807 F.Supp. 1289 (W.D.Mich.1992); *Northbrook Excess & Surp. Ins. Co. v. J.G. Wilson Corp.*, 250 Ga. 691, 300 S.E.2d 507 (1983); *Rose v. Fox Pool Corp.*, 335 Md. 351, 643 A.2d 906 (1994); *West v. El Paso Products Co.*, 122 Idaho 133, 832 P.2d 306 (1992).

■ Comparatively, a careful reading of *W. Va.Code*, 55–2–6a [1983], in its entirety, requires this Court to consider *more* than the fact that Kaiser designed the hotline on which plaintiff was injured. In particular, our statute of repose contains the following critical language which indicates that it is not intended to protect *every* defendant that performs or furnishes the activities listed therein: "The period of limitation provided in this section shall not commence until the improvement to the real property in question *has been occupied or accepted by the owner of real property, whichever occurs first.*" *Id,* in relevant part (emphasis added). In that it has been a long-standing rule of statutory construction that "the Legislature is presumed to intend that every word used in a statute has a specific purpose and meaning," *State ex rel. Johnson v. Robinson*, 162 W.Va. 579, 582, 251 S.E.2d 505, 508 (1979), this Court cannot ignore this significant statutory language. *See State v. Carper*, 176 W.Va.

309, 312, 342 S.E.2d 277, 280 (1986); *Wooddell v. Dailey*, 160 W.Va. 65, 68, 230 S.E.2d 466, 469 (1976). Therefore, " ' "[i]n ascertaining legislative intent, effect must be given to each part of the statute and to the statute as a whole so as to accomplish the general purpose of the legislation." Syl. Pt. 2, *Smith v. State Workmen's Compensation Commissioner*, 159 W.Va. 108, 219 S.E.2d 361 (1975).' Syl. Pt. 3, *State ex rel. Fetters v. Hott*, 173 W.Va. 502, 318 S.E.2d 446 (1984)." Syl. Pt. 2, *State v. White*, 188 W.Va. 534, 425 S.E.2d 210 (1992).

■ In syllabus point one of *Gibson, supra,* this Court held that

W.Va.Code, 55–2–6a, limits the time period in which a suit may be filed for deficiencies in the planning, design, or supervision of construction of an improvement to real property to ten years. This period commences on the date the improvement is occupied or accepted by the owner of the real property, whichever occurs first.

We further indicated in *Gibson,* 185 W.Va. at 220, 406 S.E.2d at 446, that the purpose of statutes of repose is to

protect architects and builders from the increased exposure to liability as a result of the demise of the privity of contract defense. Without a statute of repose, a party injured because of a latent design or defect could sue an architect or builder many years after a construction project was completed. This could result in stale claims with a distinct possibility of loss of relevant evidence and witnesses.

(citations omitted).

Other courts have likewise discussed the general purpose of statutes of repose, including the legislative intention "to protect architects, builders and the like *who have completed their jobs and who have relinquished access and control of the improvements.*" *West End Corp. v. Royals,* 450 So.2d 420, 424 (Miss.1984) (emphasis added). In *Wolfe v. Dal–Tile Corp.,* 876 F.Supp. 116, 120 (S.D.Miss.1995), the United States District Court for the Southern District of Mississippi distinguished those involved in the original

design or construction of an improvement to real property from those such as owners

> who not only are involved with the property at that phase but also retain control until the cause of action accrues [:] The continuing control over the property allows these individuals to maintain and repair the improvements to the property. Logically, when an individual has control over the property in this manner there is no need to have a time limit for filing causes of action relating to the continuing conditions of the property. On the other hand, the rationale is clear for having such a time limit for persons who relinquish control over the property and have no ability or opportunity to remedy any wrongs which exist with the property.[15]

(footnote added). *See 325–343 E. 56th Street Corp. v. Mobil Oil Corp.,* 906 F.Supp. 669, 674 (D.D.C.1995) ("Design professionals," which include architects, engineers, contractors and builders, " 'have no control over an owner whose neglect in maintaining an improvement that may cause dangerous or unsafe conditions to develop over a period of years' " are protected under the District of Columbia's statute of repose (citations omitted)); *Alsenz v. Twin Lakes Village, Inc.,* 108 Nev. 1117, 843 P.2d 834, 836 (1992) ("The legislature enacted the statutes of repose to protect persons engaged in the planning, design and construction of improvements to real property who otherwise would endure unending liability, *even after they had lost control over the use and maintenance of the improvement.*" (citation omitted and emphasis added)); *Snavely v. Perpetual Federal Savings Bank,* 306 S.C. 348, 412 S.E.2d 382, 385 (1991) (" '[A]cceptance of some future responsibility for the condition of the premises is implied in the acceptance of an improvement to real property ... [and] possession or control of the premises is a reasonable and fair basis for imposing some additional liability[.]' " (citation omitted)). *See also Worden v. Village Homes,* 821 P.2d 1291, 1294 (Wyo. 1991).

▮ In this spirit, we believe that the language of *W. Va.Code,* 55–2–6a [1983] providing that the ten-year limitation period "shall not commence until the improvement to the real property in question has been occupied or accepted by the owner of real property, whichever occurs first[,]" contemplates that someone *other than the owner of the real property* has performed the enumerated activities or services. In this case, Kaiser designed the hotline conveyor and controls at the time it owned both it and the aluminum manufacturing facility. Kaiser did not then relinquish control or possession of the hotline following completion of its design, but instead, as its owner for some thirty years, had both the right and the opportunity to evaluate its design. We hold that *W. Va.Code,* 55–2–6a [1983] does not limit the time period in which a suit may be filed against the owner of real property for deficiencies in the planning, design, survey, observation or supervision of construction or actual construction of any improvement to real property to ten years if that owner planned, designed, surveyed, observed or supervised the construction or actually constructed that improvement to real property.

### B.

In that we have already established that Kaiser is not a protected actor under *W. Va.Code,* 55–2–6a [1983], it is not necessary, for purposes of determining the applicability of the statute of repose, that we also determine whether the hotline is an improvement to real property. However, whether the hotline is an improvement to real property is relevant to our discussion below on the applicability of the Restatement (Second) of Torts § 352 regarding a vendor of real property's liability after a vendee has taken possession thereof. *See* n. 11, *supra,* and section III, *infra.*

Plaintiff maintains that the hotline is a piece of industrial equipment, that is, personal property, and as such, does not constitute an improvement to real property under *W.*

---

**15.** Mississippi's statute of repose, Miss.Code Ann. § 15–1–41 (1995), expressly provides that its ten-year limitation period "shall not apply to any person, firm or corporation in actual possession and control as owner, tenant or otherwise of the improvement at the time the defective and unsafe condition of such improvement causes injury."

*Va.Code,* 55–2–6a [1983], our statute of repose. Kaiser argues, however, that since the term "improvement to real property" is not defined in the statute, this Court should give it its plain, ordinary meaning, the result of which would place the hotline squarely within the purview of the statute.

Plaintiff's argument that the hotline is tangible personal property not covered under our statute of repose is primarily rooted in the asset purchase agreement which Kaiser entered into with its purchaser, Ravenswood Aluminum. It is plaintiff's contention that the asset purchase agreement separately listed the real and personal property to be sold and that the hotline, tilt pot operator stations, controls and related equipment were all listed and sold as tangible personal property. Thus, by Kaiser's own admission in the asset purchase agreement, plaintiff argues, the hotline was personal property and therefore not an improvement to real property.

We are not persuaded by plaintiff's argument. Whether a particular item is an improvement to real property under *W. Va. Code,* 55–2–6a [1983] requires construction of a statute and is, therefore, a question of law for the court. *Adair v. Koppers Co., Inc.,* 741 F.2d 111, 114 (6th Cir.1984); *Garner v. Kinnear Manufacturing Co.,* 37 F.3d 263, 266 (7th Cir.1994); *Krull v. Thermogas Co. of Northwood, Ia.,* 522 N.W.2d 607, 610 (Iowa 1994); *Kallas Millwork Corp. v. Square D. Co.,* 66 Wis.2d 382, 225 N.W.2d 454, 455 (1975); *Rose v. Fox Pool Corp.,* 335 Md. 351, 643 A.2d 906, 918 (1994). Since only a court can make the legal determination of whether the hotline is an improvement to real property, the classification of the hotline as either

personal property or real property in the asset purchase agreement is irrelevant. *See Adair,* 741 F.2d at 114 (conclusion by plaintiff's expert witness that item was not an improvement is irrelevant, since only a court can make that determination as a matter of law); *Beaver,* 838 F.Supp. at 210 (E.D.Pa. 1993) (It is not so much that a particular party intended certain items to be realty or personal property, but rather, " 'it is what intended use of the property was manifested by the conduct of the party.' " (citations omitted)); *O'Dell v. Lamb–Grays Harbor Co.,* 911 F.Supp. 490, 492–93 (W.D.Okla.1995) (rejected plaintiff's assertion that since item at issue was taxed as personal property, then such item cannot, as a matter of law, constitute an improvement to real property under Oklahoma's statute of repose).

Kaiser's position, on the other hand, is that of the clear majority of jurisdictions. In determining whether a particular item is an "improvement to real property" under a statute of repose, many courts have employed a "common sense" approach, giving the term its plain, ordinary, or dictionary meaning. In *Adair, supra,* plaintiff was injured when his hand became caught between the head pulley and belt on a conveyor on which he was working. In determining whether the conveyor was an "improvement to real property" under Ohio's statute of repose, the Sixth Circuit Court of Appeals looked to the dictionary definition of the term "improvement": "[A] permanent addition to or betterment of real property that enhances its capital value and that involves the expenditure of labor or money and is designed to make the property more useful or valuable as distinguished from ordinary repairs." *Id.* at 114 [16] *(quoting Kal-*

16. Other courts have likewise looked to this same dictionary definition of the term "improvement" to determine whether the particular item is an "improvement to real property" within the meaning of a statute of repose. *See, e.g., Krull, supra* (gas control valve on a furnace which allegedly caused an explosion and fire fell within Iowa's statute of repose); *Snow,* 12 F.3d at 1161 (overhead crane designed for the plant where plaintiff injured was an improvement to real property under Massachusetts' statute of repose because the crane was intended "to be a betterment of real property enhancing [the facility's] capital value and making the property more useful and valuable"); syl. pt. 1, *Thorp v. Price Bros.,*

441 N.W.2d 817 (Minn.Ct.App.1989) ("[p]lant equipment consisting of a push rod welded onto the frame of a conveyor system, which is in turn welded and bolted to steel channel iron imbedded in the concrete floor of the plant, constitutes an 'improvement to real property' under [Minnesota's statute of repose]"); *Windley v. Potts Welding & Boiler Repair Co.,* 888 F.Supp. 610 (D.Del. 1995) (air preheater at power plant covered 26,700 square feet of heating surface and was thus central to plant's function and an improvement to real property under Delaware's statute of repose). *See also Herriott, supra* and *Rose, supra* (both of which rely on a similar definition of

*las Millwork Corp. v. Square D. Co.*, 66 Wis.2d 382, 225 N.W.2d 454, 456–57 (1975) and *Webster's Third World Dictionary* (1965)) (footnote added). The *Adair* court indicated that "[i]n applying [this] definition ... courts consider whether a modification adds to the value of the property for the purpose of its intended use, as well as 'the nature of the improvement, its relationship to the land and its occupants, and its permanence.'" *Id.* (citations omitted).

Importantly, the court in *Adair* analyzed the conveyor, not in isolation, but "as an integral component in the material handling system." *Id.* at 115 ("'The issue is whether a component of a system which is definitely an improvement to real property is an improvement to real property itself. However, to artificially extract each component from an improvement to real property and view it in isolation would be an unrealistic and impractical method of determining what is an improvement to real property. Frequently, as in this case, an improvement to real property is going to consist of a complex system of components.'" (quoting *Mullis v. Southern Co. Services, Inc.*, 250 Ga. 90, 296 S.E.2d 579, 584 (1982)). Applying the above, the court ultimately concluded that the conveyor was an improvement to real property under Ohio's statute of repose. *Adair*, 741 F.2d at 116. *See* syl. pt. 1, *Brennaman v. R.M.I. Co.*, 70 Ohio St.3d 460, 639 N.E.2d 425 (1994) ("When determining whether an item is an improvement to real property under [Ohio's statute of repose], a court must look to the enhanced value created when the item is put to its intended use, the level of integration of the item within any manufacturing system, whether the item is an essential component of the system, and the item's permanence.")) [17]

■ We are persuaded by the court's analysis in *Adair* and in the other cases cited above. *See* n. 16, *supra.* Accordingly, when determining whether an item is an improvement to real property under *W. Va. Code*, 55–2–6a [1983], the statute of repose, a court must consider the enhanced value created when the item is put to its intended use, the level of integration of the item within any manufacturing system, whether the item is an essential component of the system, and the item's permanence. These factors should be considered in making the case by case determination of whether an item is an improvement to real property under *W. Va. Code*, 55–2–6a [1983]. *See Beaver*, 838 F.Supp. at 210–11; *Rose*, 643 A.2d at 918.

We find, in the present case, that the hotline clearly enhanced the value of the aluminum manufacturing facility when put to its intended use of processing aluminum ingots. We further find that the hotline and its components were integrated into the facility to such a degree that, without them, the facility could not function in the manner intended. Finally, though the hotline and its components could be removed, they have been embedded into the floor of the facility and have operated continuously since the facility was built in the 1950s and are, therefore, permanent. Accordingly, we hold, as a matter of law, that the hotline is an improvement to real property within the meaning of *W. Va. Code*, 55–2–6a [1983].

### III.

Kaiser's second argument on appeal is that the trial court should have applied the Restatement (Second) of Torts § 352, which would have barred plaintiff's claim against it for negligent design of the hotline as a matter of law. As previously indicated, the trial judge denied Kaiser's motion for summary judgment and subsequent motion for a directed verdict, both of which motions were made, *inter alia*, on the ground that the Restatement (Second) of Torts § 352 barred

"improvement" as defined in *Black's Law Dictionary* ).

17. In *Brennaman*, the Supreme Court of Ohio also declared that "[a]t a minimum, Section 16, Article I [of the Ohio Constitution] requires that the plaintiffs have a reasonable period of time to enter the courthouse to seek compensation after the accident." *Id.*, 639 N.E.2d at 430. In that

plaintiffs filed their complaints within one year after their causes of action arose, which the court held to be a reasonable time, Ohio's ten-year statute of repose was deemed unconstitutional, as violative of "the right to a remedy guaranteed by Section 16, Article I of the Ohio Constitution." *Id.*, 639 N.E.2d at 430.

plaintiff's claim as a matter of law. Kaiser subsequently offered a jury instruction regarding application of § 352, which was likewise rejected by the trial court. The Restatement (Second) of Torts § 352, which has not heretofore been adopted in this jurisdiction, provides:

> Except as stated in § 353, a vendor of land is not subject to liability for physical harm caused to his vendee or others while upon the land after the vendee has taken possession by any dangerous condition, whether natural or artificial, which existed at the time that the vendee took possession.

As we have already established, *W. Va. Code,* 55–2–6a [1983], our statute of repose does not protect the owner of real property for, *inter alia,* deficiencies in the design of an improvement to real property if that owner designed the improvement. Whether that owner, upon the sale of the real property, becomes free from liability for injuries caused to his vendee or others while upon the realty after the vendee has taken possession by any dangerous condition, whether natural or artificial, which existed at the time the vendee took possession is a question that must be addressed. Restatement (Second) of Torts § 352. In other words, is Kaiser, the designer of the hotline and creator of the dangerous condition, excused from liability for plaintiff's injuries because it sold the hotline to Ravenswood aluminum *two years prior to plaintiff's accident?*

### A.

Restatement (Second) of Torts § 352 is derived from the ancient doctrine of caveat emptor, under which, absent an express agreement, "the vendor of land was not liable to his vendee, or a fortiori any other person, for the condition of the land existing at the time of the transfer." *Id.* at comment a. Rather, "[t]he vendee is required to make his own inspection of the premises, and the vendor is not responsible to him for their condition, existing at the time of the transfer. Still less is he liable to any third person who

may come upon the land, even though such entry is in the right of the vendee." *Id. See Andrews v. Casagrande,* 167 Ariz. 71, 804 P.2d 800 (App.1990) (former homeowners who purchased, assembled and installed above-ground swimming pool were protected under § 352 from liability for injuries sustained from child's near-drowning); *Papp v. Rocky Mountain Oil and Minerals,* 236 Mont. 330, 769 P.2d 1249 (1989) (former owner who was also builder of oil separator facility not liable for death of employee of subsequent owner under § 352); *Preston v. Goldman,* 42 Cal.3d 108, 227 Cal.Rptr. 817, 720 P.2d 476 (1986) (under § 352, former homeowners who designed and built pond in backyard not liable for subsequent injury to child who nearly drowned).

Two exceptions to this rather hard-line rule of nonliability have emerged and have been applied in many jurisdictions. The first exception, found in Restatement (Second) of Torts § 353, provides, *inter alia,* that a vendor of real property "who conceals or fails to disclose to his vendee any condition ... which involves unreasonable risk to persons on the land, is subject to liability ... for physical harm caused by the condition after the vendee has taken possession[.]"[18] There is no contention in this case that Kaiser, the vendor, concealed or failed to disclose to its vendee, Ravenswood Aluminum, the dangerous condition which caused plaintiff's injuries.

### B.

The remaining exception to Restatement (Second) of Torts § 352 is found in a number of cases where real property, when it is transferred, is in a condition which poses an unreasonable risk of harm to others. In such cases, the vendor remains subject *at least for a reasonable time,* to any liability he would have incurred had he remained in possession for injuries to others caused by such a condition. Prosser and Keeton on Torts § 64 at 448 (5th ed. 1984). *See Boise*

---

18. *Cf.* syllabus, *Thacker v. Tyree,* 171 W.Va. 110, 297 S.E.2d 885 (1982) ("Where a vendor is aware of defects or conditions which substantially affect the value or habitability of the property and the existence of which are unknown to the purchaser and would not be disclosed by a reasonably diligent inspection, then the vendor has a duty to disclose the same to the purchaser. His failure to disclose will give rise to a cause of action in favor of the purchaser.")

*Car and Truck Rental Co. v. Waco, Inc.*, 108 Idaho 780, 702 P.2d 818, 821 (1985). This exception evolved, in part, because a vendor's responsibility to others is regarded to be of such social importance that he is not permitted in every situation to shift such responsibility automatically upon the sale. Prosser, *supra* at 448. As to both exceptions, however, "it seems obvious that there must be some time limit upon the duration of the potential liability" of the vendor after possession is transferred. *Id.* (footnote omitted).

Several cases addressing the latter exception to Restatement (Second) of Torts § 352 have followed the emerging view that where the vendee of real property has knowledge of the dangerous condition at the time of the conveyance but sufficient time has not elapsed at the time of an accident to allow the vendee to remedy the defect, liability remains with the vendor—the person who created the danger or who was responsible for its continuance—until the vendee has had reasonable time to discover and remedy it. The question of whether the vendee had a reasonable time to cure the defect or dangerous condition is a question of fact and is therefore for the jury. *See Brown v. O'Connor*, 193 A.D.2d 1088, 598 N.Y.S.2d 629 (1993) (Where subsequent owner had control and possession over property for only 52 days before plaintiff injured thereon, it was a question for jury whether that was reasonable time for subsequent owner to correct alleged defect, thereby excusing prior owner's liability.) *Meece v. Hogue*, 334 So.2d 285, 286 (Fla.Ct.App.1976) (Vendor of real property not liable for damage to house resulting after a reasonable time following discovery of termites.); *Zucker v. Capitelli*, 736 F.Supp. 449, 454 (E.D.N.Y.1990) (Although title and control of real property were surrendered by former owner and creator of dangerous condition two weeks before accident, prior owner may be liable if jury determines that sufficient time had not passed for

vendee to discover and remedy or repair alleged defects.). *See also Cogliati v. Ecco High Frequency Corp.*, 181 N.J.Super. 579, 439 A.2d 91 (App.Div.1981); *Smith v. Monmaney*, 127 Vt. 585, 255 A.2d 674 (1969).[19]

The above cases are congruous with our prior discussion of *W. Va.Code*, 55-2-6a [1983], in which we indicated that those who plan, design, survey, observe or supervise construction of an improvement to real property, other than owners of real property, having relinquished control over the property and having no ability or opportunity to remedy wrongs which exist thereon, should not endure unending liability, but, under our statute of repose, are excused from liability after a period of ten years. *See Id.* section II, subsection A, *supra*. *See, e.g., Wolfe, supra*.

▆▆▆ In contrast, Kaiser's argument both at trial and on appeal was that, under Restatement (Second) of Torts § 352, plaintiff's claim against it is barred, as a matter of law, because Kaiser transferred the aluminum manufacturing facility, including the hotline, to Ravenswood Aluminum prior to plaintiff's injury. As we indicated above, Kaiser offered a jury instruction regarding Restatement (Second) of Torts § 352,[20] even though § 352 has not been adopted in this jurisdiction. This Court has held that " '[a]n instruction which does not correctly state the law is erroneous and should be refused.' *State v. Collins*, 154 W.Va. 771, 180 S.E.2d 54 (1971)." Syl. pt. 2, *McGlone v. Superior Trucking Co.*, 178 W.Va. 659, 363 S.E.2d 736 (1987). *See W. Va. R. Civ. P.* 51. We find therefore that the trial court correctly refused Kaiser's proffered jury instruction on Restatement (Second) of Torts § 352. We decline to further address whether the trial judge would have erred if an instruction was offered and refused on an exception to Restatement (Second) of Torts § 352. As we held in syllabus point 4 of *State ex rel. State Line Sparkler v. Teach*, 187 W.Va. 271, 418

---

19. *But see O'Connor v. Altus*, 67 N.J. 106, 335 A.2d 545, 549 (1975) (*As a matter of law*, nine years "much more than a reasonable time" for vendee to have discovered and repaired defective conditions of which vendor had knowledge).

20. The transcript reveals only that Kaiser's proposed jury instruction number 14 on Restatement (Second) of Torts § 352 was offered, but rejected by the trial judge. No further discussion of the proposed instruction is apparent from the transcript.

S.E.2d 585 (1992): " ' "This Court will not pass on a nonjurisdictional question which has not been decided by the trial court in the first instance." Syllabus Point 2, *Sands v. Security Trust Co.*, 143 W.Va. 522, 102 S.E.2d 733 (1958).' ' Syllabus Point 2, *Duquesne Light Co. v. State Tax Department*, 174 W.Va. 506, 327 S.E.2d 683 (1984), *cert. denied*, 471 U.S. 1029, 105 S.Ct. 2040, 85 L.Ed.2d 322 (1985)."

### C.

*W.Va.Code*, 55–2–6a [1983], our statute of repose, does not limit the time period in which a suit may be filed against an owner of real property for deficiencies in the planning, design, survey, observation or supervision of construction or actual construction of any improvement to real property to ten years if that owner planned, designed, surveyed, observed or supervised the construction or actually constructed that improvement to real property. Should the legislature choose to limit the time period in which a suit may be filed against owners of real property who perform the above activities with regard to improvements to real property, it is free to amend *W. Va.Code*, 55–2–6a [1983] accordingly. In addition or, in the alternative, the legislature is free to adopt Restatement (Second) of Torts § 352 which would excuse a vendor of real property from liability for injuries caused to its vendee or others while upon the property after the vendee has taken possession by any dangerous condition whether natural or artificial, which existed at the time the vendee took possession.

### IV.

As its third assignment of error, Kaiser argues that the trial court improperly admitted into evidence testimony regarding certain safety standards for the design and guarding of conveyors. Kaiser argues that these standards were compiled by voluntary organizations, have not been commonly accepted or widely followed in the aluminum manufacturing or other industry and do not have "the force of law."

Testimony regarding certain safety standards was elicited from plaintiff's mechanical engineering expert, Dr. Rolin Barrett. Dr. Barrett, after reviewing the specifications for the hotline, for the mechanical components, motors and controls thereon, as well as the various blueprints and electrical drawings which existed at the time the hotline was built, opined that the controls "were not safe in that they allowed the operation of the segments of the conveyor while a person was out there and this person had no way of blocking someone else from turning on the controls or turning on the motors and moving things on the conveyors while he was out there." Dr. Barrett then referred specifically to several safety standards regarding the design of conveyors and which he testified applied to the conveyor in this case. It is the admissibility of these safety standards which Kaiser challenges in this appeal.

During the course of his testimony, Dr. Barrett indicated that Kaiser's design of the conveyor and controls did not follow the Model Code of Safety Regulations for Industrial Establishments for the Guidance of Governments and Industry—International Labor Offices (1949), Regulation 164, Section 17;[21] American Standards Safety Code for Conveyors, Cableways, and Related Equipment, B20.1, Section 610 (1947 and 1957), regarding Interlocking Devices;[22] and American National Standards Institute—Safety Standards for Conveyors and Related Equipment,

---

**21.** The Model Code of Safety Regulations for Industrial Establishments for the Guidance of Governments and Industry—International Labor Offices (1949), Regulation 164, Section 17 provides: "Where two or more conveyors are operated together, the controlling devices shall be arranged that no conveyor can feed onto a stopped conveyor."

**22.** The American Standards Safety Code for Conveyors, Cableways, and Related Equipment,

B20.1, Section 610 (1947 and 1957), regarding Interlocking Devices, provides:

On all conveyor systems where practical, electrical and/or mechanical devices should be provided to automatically stop a conveyor when the conveyor, bin, hopper, chute, etc., to which it feeds, has been stopped or has been blocked with loads so that it cannot receive additional loads or material.

B20.1, Section 5.09.1.1 and 5.09.1.2 (1976).[23] Dr. Barrett testified that, contrary to these safety standards, or suggestions, the conveyor designed by Kaiser did not include a device which would automatically stop one section of the conveyor from feeding onto another stopped section.[24]

It is Kaiser's argument that the above-cited safety standards, or suggestions, were compiled by voluntary organizations, have been neither widely-followed nor commonly-accepted in the aluminum manufacturing industry or other industry, and do not have "the force of law." Kaiser thus contends that it was reversible error for the trial court to admit Dr. Barrett's testimony at trial.

■■■ This Court has previously held that " '[t]he admissibility of testimony by an expert witness is a matter within the sound discretion of the trial court, and the trial court's decision will not be reversed unless it is clearly wrong.' Syl. Pt. 6, *Helmick v. Potomac Edison Co.*, 185 W.Va. 269, 406 S.E.2d 700 (1991)." Syl. pt. 1, *Mayhorn v. Logan Medical Foundation*, 193 W.Va. 42, 454 S.E.2d 87 (1994). We find that the trial court committed no error in allowing Dr. Barrett to testify about the safety standards.

■■■ During both direct and cross-examination of Dr. Barrett, it was repeatedly pointed out that the subject safety standards, or suggestions, do *not* have "the force of law" and are intended as recommendations, not requirements, for the safe design and manufacture of equipment. Nevertheless, as the Fifth Circuit Court of Appeals observed in *Frazier v. Continental Oil Co.*, 568 F.2d 378, 382 (5th Cir.1978) (*quoting Muncie Aviation Corp. v. Party Doll Fleet, Inc.*, 519 F.2d 1178, 1183 (5th Cir.1975)), the safety standards and codes such as those compiled by ANSI are

'representative of "a consensus of opinion carrying the approval of a significant segment of an industry" and [are] offerable as exemplifying safety practices prevailing in the industry.[25] Courts have become increasingly appreciative of the value of national safety codes and other guidelines issued by governmental and voluntary associations to assist the trier of fact in applying the standard of due care in negligence cases. Though the law is by no means settled, this Court finds that the inherent trustworthiness of such codes and recommendations, coupled with the need for their introduction in order to impart relevant information not contained elsewhere, is sufficient to justify their admission, notwithstanding the traditional dangers of hearsay evidence.' [26]

(footnotes added). *See Brown v. Clark Equipment Co.*, 62 Haw. 530, 618 P.2d 267, 276 (1980) ("[S]afety data, codes or standards ... promulgated by voluntary industry organizations ... are admissible as evidence on the issue of negligence ... [and are] admissible as an alternative to or utilized to buttress

---

**23.** American National Standards Institute ("ANSI")—Safety Standards for Conveyors and Related Equipment, B20.1, Section 5.09.1.1 (1976) provides: "When two or more pieces of equipment are interfaced, special attention shall be given to the interfaced area to ensure adequate guarding and safety devices."
   Section 5.09.2.1 (1976) provides:
   Where necessary for the protection of employees from hazards, all exposed moving machinery parts that present a hazard to employees at their work station shall be mechanically or electrically guarded or guarded by location or position except in the case of an overhead trolley conveyor or hanger-suspended tray conveyor, when such guarding would render the conveyor unusable or would be impractical. In such case, prominent and legible warnings shall be posted in the area or on the equipment, and, where feasible, lines shall be painted on the floor delineating the danger area. In order to be guarded solely by location or posi-

tion, all moving parts which require guarding to protect employees against hazards shall be at least seven feet [2.14 meters] above the walkway, roadway, or walking surface or otherwise located so that employees cannot come into contact with the hazardous moving parts while in their workplace station.

**24.** According to Dr. Barrett, the safety standards do not set forth specifically what type of device to install.

**25.** Dr. Barrett agreed, testifying that safety standards such as the ones admitted at trial were compiled by people who represent a wide variety of interests in a particular industry and whose common purpose is to outline safety standards.

**26.** There is no contention in this case that the safety standards were inadmissible because they constituted hearsay evidence.

expert testimony.") Clearly then, evidence of safety standards " 'may be relevant and admissible even though the standards have not been imposed by statute or promulgated by a regulatory body and therefore do not have the force of law.' " *Ross v. Black & Decker, Inc.,* 977 F.2d 1178, 1184 (7th Cir. 1992) (*quoting Ruffiner v. Material Service Corp.,* 116 Ill.2d 53, 106 Ill.Dec. 781, 784, 506 N.E.2d 581, 584 (1987), *cert. denied,* 507 U.S. 917, 113 S.Ct. 1274, 122 L.Ed.2d 669 (1993)). *See also Ruhs v. Pacific Power & Light,* 671 F.2d 1268, 1273 (10th Cir.1982). Based upon the above, we conclude that it was not error for the trial court to admit the above-cited safety standards into evidence.

V.

Kaiser's fourth assignment of error is rooted primarily in plaintiff's jury instruction number four, which indicated, *inter alia,* that Kaiser, in designing the conveyor system and controls, "was required to anticipate the environment in which the system would be used and was required to design and guard it against reasonably foreseeable uses in that setting." Kaiser argues that it could not have foreseen, at the time it designed the hotline, that the "environment" or "setting" at the facility would include a labor dispute resulting in the hiring of "inexperienced" replacement workers who would then operate and work on the hotline.

■■■ This Court has previously held that "[t]he ultimate test of the existence of a duty to use care is found in the foreseeability that harm may result if it is not exercised. The test is, would the ordinary man in the defendant's position, knowing what he knew or should have known, anticipate that harm of the general nature of that suffered was likely to result?" Syl. pt. 3, *Sewell v. Gregory,* 179 W.Va. 585, 371 S.E.2d 82 (1988). Kaiser maintains that plaintiff's jury instruction number four did not follow this general test of foreseeability, that is, that harm might result from its design of the hotline. Rather, Kaiser complains that the jury instruction required it to foresee "an 'environment' in which the system would be used.... By any objective standard, the 'environment' of 1991 was quite different from [the] 'environment'

of the late 1950's and one which Kaiser could not have reasonably anticipated over thirty-years prior to 1991."

■■■ The complete text of plaintiff's jury instruction number four, which was read over Kaiser's objection, provided:

You are instructed that [Kaiser] owed a duty to exercise reasonable care in designing its conveyor system and controls so that the operation of that conveyor system and controls would be reasonably safe for all foreseeable users. In designing the conveyor system and controls, [Kaiser] was required to anticipate the environment in which the system would be used and was required to design and guard it against reasonably foreseeable uses in that setting. The focus in design negligence cases is not on how the system is meant to function, but whether the system was designed with reasonable care to eliminate reasonably foreseeable and avoidable dangers. In determining the extent of Kaiser's duty to design the controls for the system in order to make it reasonably safe for foreseeable uses, you may consider the severity and magnitude of the risk of harm posed by the conveyor system and the ease with which the risk of harm could have been avoided or reduced by redesigning the system so as to make it reasonably safe.

Therefore, if you find by a preponderance of the evidence, that [Kaiser] failed to design its conveyor system and controls in the place of [plaintiff's] accident so as to make it reasonably safe for foreseeable uses, and if such failure in the design of the system proximately caused or contributed to cause the injuries suffered by [plaintiff], then you may find [Kaiser] was negligent and assess that negligence in accordance with the Court's other instructions.

(citations omitted). We find no merit in Kaiser's interpretation of the above instruction. Contrary to Kaiser's argument, we find that the instruction did not require Kaiser to foresee an "environment" of "inexperienced" workers operating the hotline. Rather, plaintiff's jury instruction number four clearly indicates that Kaiser, in designing its conveyor system and controls, had a duty to exercise reasonable care so as to avoid the

harm which resulted in this case. Evidence introduced at trial revealed that Kaiser redesigned the conveyor system in the late 1960s or early 1970s, resulting in a reduced margin of safety for tilt pot operators out on the walkway. *See* n. 5, *supra*. Furthermore, the testimony of Kaiser's expert in aluminum hot rolling production and technology, Robin Buller, a Kaiser employee, indicated that, during his tenure at the facility in Ravenswood, heated ingots were, on occasion, inadvertently sent back onto the conveyor, causing one ingot to bump into another. Although in those instances, there was no tilt pot operator on the walkway and no injuries resulted, the jury could reasonably have concluded from this testimony that Kaiser could foresee that a serious injury such as plaintiff's would result from its failure to exercise reasonable care.

## VI.

The final issue for our review is whether the jury awards of $71,166 for past lost wages and $42,435 for future lost wages were supported by the evidence.[27]

The jury was presented with the following relevant evidence: plaintiff's testimony that he earned $9.00 or $9.25 per hour, plus 15% in benefits between December 22, 1990, the date of his employment at Ravenswood Aluminum, and January 22, 1991, the date of the accident; plaintiff's testimony that he earned $11.25 per hour during a six-week period beginning in February of 1992 when he returned to work at Ravenswood Aluminum,[28] for a total sum, according to his W–2 form, of $5,104; and plaintiff's testimony that he earned $3,000 or $4,000 as compensation for performing menial tasks for people from May of 1992 until October 27, 1994, the date of his trial testimony. Plaintiff further testified that he was expected to complete his Masters

of Science degree in December of 1995 and that, according to the West Virginia Department of Labor, he could expect to obtain employment six months thereafter.

■■■ This Court has previously held that " '[t]he general rule with regard to proof of damages is that such proof cannot be sustained by mere speculation or conjecture.' Point 1, Syllabus, *Spencer v. Steinbrecher*, 152 W.Va. 490, [164 S.E.2d 710]." Syl. pt. 5, *Sisler v. Hawkins*, 158 W.Va. 1034, 217 S.E.2d 60 (1975). *See also Ferguson v. R.E. Ball and Co.*, 153 W.Va. 882, 887, 173 S.E.2d 83, 86 (1970); *Little v. Little*, 184 W.Va. 360, 363, 400 S.E.2d 604, 607 (1990).

■■■ We find that plaintiff's testimony regarding his past wages, beginning with his employment at Ravenswood Aluminum in December of 1990, adequately supported the jury award of $71,166 as reduced by the trial judge for past lost wages. However, plaintiff's testimony with respect to his future lost wages was highly speculative.

■■■ Plaintiff was required to establish through expert testimony, not only the existence of a permanent injury, but also, the injury's "vocational effect on the plaintiff's work capacity, and an economic calculation of the monetary loss over the plaintiff's work-life expectancy reduced to a present day value." Syl. pt. 2, in part, *Liston v. University of West Virginia*, 190 W.Va. 410, 438 S.E.2d 590 (1993). Plaintiff's testimony that he could expect to find employment six months following completion of his degree in December of 1995 clearly did not meet this requirement. The jury's award of future lost wages was, therefore, based upon mere speculation and conjecture and cannot be sustained. Syl. pt. 5, *Sisler, supra*. Accordingly, an additional remittitur shall be ordered by the circuit court of that portion of the

---

27. The jury specifically assessed the following damages, as reflected in the verdict form: past medical expenses (stipulated by the parties), $113,700; past lost wages, $75,000; future lost wages, $45,000; damages, if any, for past and future pain and suffering, mental pain and anguish, disfigurement, humiliation, permanent impairment, and loss of enjoyment of life, $500,000. As we indicated earlier, by order of February 24, 1995, the trial court ordered that the jury's calculation of both past and future lost wages be corrected by remittitur as follows: that the $75,000 award for past lost wages be reduced by

$3,834, to $71,166 and that the $45,000 award for future lost wages be reduced by $2,565, to $42,435. *See* n. 1, *supra*.

28. Plaintiff testified that, although he returned to Ravenswood Aluminum after the accident, he was unable to continue working there because "[t]here was a tremendous amount of pain from the stump [plaintiff's amputated leg] and we were working 12–hour shifts on your feet all day and it got so bad at the end of the shift that I could hardly walk out to the car."

verdict awarding plaintiff $42,435 for future lost wages. As we held in syl. pt. 2, *Earl T. Browder, Inc. v. County Court of Webster Co.,* 145 W.Va. 696, 116 S.E.2d 867 (1960) " '[w]hen the illegal part of the damages ascertained by the verdict of a jury is clearly distinguishable from the rest, and may be ascertained by the court without assuming the functions of the jury and substituting its judgment for theirs, the court may allow plaintiff to enter a *remittitur* for such part, and then refuse a new trial.' Point 4, Syllabus, *Chapman v. [J.W.] Beltz & Sons Co.,* 48 W.Va. 1 [35 S.E. 1013]." *See also Reed v. Wimmer,* 195 W.Va. 199, 210, 465 S.E.2d 199, 210 (1995).

## VII.

For the reasons discussed herein, the judgment of the Circuit Court of Kanawha County is affirmed insofar as *W. Va.Code,* 55–2–6a [1983] and Restatement (Second) of Torts § 352 did not bar plaintiff's claim as a matter of law; certain safety standards were admissible; and plaintiff's jury instruction number four was properly given. However, this case is reversed with respect to that portion of the verdict awarding plaintiff $42,-435 for future lost wages. We therefore remand this case to the circuit court to enter an additional remittitur order of $42,435.

Affirmed, in part; reversed, in part, and remanded, with directions.